UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JERE EATON,                          :
                                     :
    Plaintiff,                       :
                                     :
    v.                               : No. 3:06CV01664(DJS)
                                     :
THE COCA-COLA COMPANY,               :
                                     :
    Defendant.                       :

## MEMORANDUM OF DECISION AND ORDER

The plaintiff, Jere Eaton ("the Plaintiff") brings this action against the defendant, the Coca-Cola Company ("the Defendant") alleging that the Defendant discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq. ("Title VII") and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60 et seq. ("CFEPA"). The Defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, the Defendant's motion for summary judgment **(Dkt. # 36)** is **GRANTED in part** and **DENIED in part**.


## I. FACTS

In 1999, African American employees brought a class action lawsuit alleging that Coca-Cola's "common compensation, promotion and performance evaluation systems are subjective, discretionary

-1-

and un-monitored" and "fostered a pattern and practice of race discrimination against African-American employees, under both a disparate treatment theory and a disparate impact theory." Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 698 (N.D. Ga. 2001). That lawsuit resulted in a settlement agreement that provided "far-reaching" programmatic relief to the class. Id. at 687. One aspect of that programmatic relief was the creation of an independent task force charged with overseeing Coca-Cola's compliance with the terms of the settlement. Id.

The task force created as the result of the settlement in Ingram issued annual reports from 2002 through 2006. In its Second Annual Report, dated December 1, 2003, the task force noted that "[i]nvoluntary termination rates were generally similar for whites and minorities across all job levels except Sales Workers, where the minority termination rate was substantially higher than the rate for non-minority employees. . . ." (Dkt. # 51, Ex. 3) In its Fourth Annual Report, dated December 1, 2005, the task force concluded that "involuntary termination rates were generally higher for minorities than for whites across all job levels. Further investigation of these differences should be explored by the Company." Id. Likewise, the task force's Fifth Annual Report, dated December 1, 2006, notes that "involuntary termination rates were higher for

-2-

minorities than for whites across all job levels, most noticeably for executives and sales employees.  Further investigation of these differences should be explored by the Company."  Id.

In August 1996, the Defendant hired the Plaintiff, who is African American.  The Plaintiff received sales training from the Defendant in Irvine, California.  In November 1996, the Plaintiff became a District Sales Manager for the Defendant in Oregon.  As a District Sales Manager, the Plaintiff managed a team of six salespersons and was responsible for managing relationships with existing customers and meeting sales quotas.

In June 1998, the Plaintiff obtained a sales position as an Account Executive 2 in Stamford, Connecticut.  The Plaintiff has indicated that she took this position in order to be closer to her mother, who lived in Connecticut and had been ill.  In this position, the Plaintiff worked out of her home in Stamford, and did not have any supervisory responsibilities.  She remained in this position until 2000, when the Defendant underwent a reorganization that affected nearly every employee of the Defendant.  The Plaintiff's job title changed to Business Development Manager, and the Plaintiff testified that this reorganization "decentralized" everything, giving her more responsibility for maintaining relationships with the Defendant's customers and partners.  As a result of the reorganization, the

Plaintiff began reporting to Dan Sweeney ("Sweeney"), who was based in New York City.

The Plaintiff remained a Business Development Manager until the spring of 2003, when the Defendant underwent another company-wide reorganization.  The Plaintiff's job title then changed to Sales Executive.  Her job duties did not change as a result of the reorganization, although some of her customer accounts did change.  For example, while she no longer handled the Defendant's accounts for Fine Host Corp and Imax Theatres, she added the University of Connecticut, Yale University, Great American Restaurants, Food Bag, and Navin Brothers Food Service to her existing client list.  She also had Duchess Restaurants ("Duchess") and Ranch 1 on her client list.

Sweeney lost his position after the reorganization.  Thus, in April 2003, the Plaintiff began reporting to the Director of Area Sales, Francis Fitzpatrick ("Fitzpatrick").  At the time, Fitzpatrick was responsible for the Defendant's beverage sales in New York, northern New Jersey, and Connecticut.  Fitzpatrick's primary duties were to manage a sales team and meet annual product-sales objectives.  Although he was based in Stamford, Fitzpatrick spent much of his time on the road and was only in the Stamford office two days per week.

Duchess was a large and important client to the Defendant

and its contract with the Defendant was scheduled to expire at the end of 2003. Shortly after she began reporting to Fitzpatrick, the Plaintiff attended a meeting with Fitzpatrick and Duchess representatives to start the renegotiation process. According to the Defendant, the meeting did not go well. The Defendant claims that, during the meeting, the Plaintiff made a presentation to the Duchess representatives, who frequently interrupted her to state how things had gone wrong in the past, particularly with respect to promotions that had not been properly executed. According to the Defendant, the Plaintiff began to defend herself during the meeting which caused some friction. The Defendant maintains that the Plaintiff did not handle the meeting well. The Plaintiff, for her part, denies that she ever became "defensive" during the meeting, and denies any allegation that she mishandled the meeting.

Shortly after the 2003 reorganization, Fitzpatrick recommended to his boss, Susan Gambardella ("Gambardella") that someone be hired to manage the Defendant's Connecticut-based sales team. In July 2003, Elizabeth Coveney ("Coveney"), a long-time employee of the Defendant, was hired to become the Director of Area Sales for the Boston area. This was a peer-level position to Fitzpatrick's. Coveney's position, based in Waltham, Massachusetts, ultimately included supervisory authority over the

Stamford office.  Coveney, like Fitzpatrick, reported to Gambardella.  The Plaintiff reported to both Coveney and Fitzpatrick when Coveney first arrived in Waltham.  The Defendant claims that this was done to help Coveney gain experience in negotiating sales contracts with customers.

Shortly after arriving in Waltham, Coveney met with Fitzpatrick and the Plaintiff at a hotel in Connecticut.  During this meeting, they discussed the Duchess renegotiation and how it should be handled in the future.  At some point during the meeting, the Plaintiff inquired as to whom she would be reporting.  Coveney responded, "Well, I guess for a while, you'll have two masters."  The Plaintiff claims that she found this remark to be racially offensive.

The performance for a sales executive of the Defendant is measured according to an annual Performance Development Plan ("PDP"), which sets forth objective and subjective goals for the employee.  The PDP is created at the beginning of the calendar year through a process between the salesperson and her manager. After the PDP is established, there are periodic meetings between the manager and the salesperson to discuss how the salesperson is measuring up to the goals established in the PDP.  Salespersons participate in one formal mid-year evaluation during which they are advised as to whether they are "on track" with their PDP

goals.  In addition, salespersons participate in a year-end
evaluation at which they receive a final performance rating.
During the Plaintiff's employment with the Defendant, the final
PDP ratings were: (1) "CE" for "clearly exceeds"; (2) "ME" for
"meets and exceeds"; (3) "SM" for "successfully meets"; "MS" for
"meets some"; and "FM" for "fails to meet."

In the Plaintiff's 2003 PDP mid-year review, which seemed to
focus primarily on the Plaintiff's interactions with Duchess,
Fitzpatrick described certain strengths and weaknesses of the
Plaintiff's job performance.  With regard to "strategic
thinking," Fitzpatrick wrote that the Plaintiff "is good at the
tactical level of the product sale, but needs to develop the
skill of taking a broader, longer term view of her customers to
identify long term actions which will develop stronger
relationships."  (Dkt. # 42, Ex. 4.)  With regard to
"communication/teamwork," Fitzpatrick wrote that the Plaintiff
"is good at ensuring call plans are done prior to the calls, and
written follow-up is conducted in a timely manner after the
calls.  However, her verbal communication tends to be directive
and sometimes blaming versus empathetic and teamwork oriented.
She gets defensive and abrasive too quickly, and has alienated
some of her cross-functional support."  (Id.)

In addition to the mid-year review, Fitzpatrick wrote a

memorandum to the Plaintiff, dated August 13, 2003, wherein he stated that he wanted to "capture in writing some of the verbal feedback" he had given her. (Id., Ex. 5.) As with the mid-year review, the memorandum discussed the Plaintiff's interactions with Duchess, and described Fitzpatrick's perception of the Plaintiff's alleged strengths and weaknesses at her job. (See id.) The Plaintiff, for her part, disputes Fitzpatrick's descriptions of her weaknesses. In a memorandum dated August 25, 2003, the Plaintiff responded to Fitzpatrick's memorandum. (See id., Ex. 6.) It appears that the Plaintiff felt that, despite her efforts, Duchess and its representatives had been "hostile," and had responded "negatively" during her interactions with them. (See id.)

In August 2003, Coveney conducted a team meeting in Waltham at which salespersons made presentations about their portfolios. During the Plaintiff's presentation, she became upset when discussing the Duchess account. The Plaintiff told the team that she "hated" the Duchess account, left the room, and started to cry. Coveney claims that the Plaintiff's behavior caused her some concern because the Defendant was renegotiating its contract with Duchess, a large and important account. Coveney suggested that the meeting break. Thereafter, Michael Newman ("Newman"), another salesperson on the team, and Gambardella exited the room

to console the Plaintiff.  Coveney then approached the Plaintiff
and asked to speak with her privately after the meeting had
concluded.

During that private meeting, Coveney told the Plaintiff that
it was unacceptable for her to say at a team meeting that she
hates any account, and the Plaintiff agreed.  The Plaintiff told
Coveney that although dealing with Duchess was at times very
frustrating, she was committed to seeing the renegotiation
through.

In September 2003, another meeting with the Duchess
representatives took place.  A number of high-level Duchess
representatives attended the meeting, as did the Plaintiff,
Fitzpatrick, and Coveney.  It appears that this meeting went
better than the previous meeting.  The parties dispute, however,
the cause for this.  The Defendant claims that Coveney played an
important role in making the meeting run smoothly, whereas the
Plaintiff claims that she was the one who led the meeting and
performed well.

After this meeting, Coveney and the Duchess representatives
spoke privately.  The Duchess representatives told Coveney that
they were not happy with the Plaintiff, and that they wanted her
removed from the Duchess account.  Coveney testified that the
Duchess representatives stated that the Plaintiff brought

"negative value" to the renegotiation. Coveney further testified
that she asked the representatives to expand on this, and they
apparently replied that the Plaintiff "did not deliver on her
commitments," that "simple things [with the Plaintiff] became
complex," and that the Plaintiff "did not respect their
protocol." (Dkt. # 40, Ex. 2)

Coveney shared this information with Fitzpatrick, as it was
the first time one of his clients had asked for an executive to
be removed from an account. Coveney and Fitzpatrick apparently
did not want to simply remove the Plaintiff from the account
altogether. Accordingly, they decided that, going forward,
Coveney would be the customer contact, and the Plaintiff would
continue to work on the account behind the scenes.

Thereafter, Coveney told the Plaintiff that the Duchess
representatives wanted her removed from the account and explained
the arrangement she and Fitzpatrick had reached to keep the
Plaintiff involved. Coveney then documented Duchess' comments
about the Plaintiff in a memorandum to Fitzpatrick dated
September 28, 2003. Notwithstanding the arrangement to have the
Plaintiff work on the Duchess account behind the scenes, on
October 1, 2003, the Plaintiff requested to be removed completely
from the account. After discussing the matter with Fitzpatrick,
Coveney decided to grant the Plaintiff's request. In an October

2, 2003 email to the Plaintiff, Coveney confirmed that the
Plaintiff had been removed from the Duchess account.  Coveney
also advised the Plaintiff to redirect her focus on "new business
development opportunities" so that she could "demonstrate and
develop [her] strategic thinking and selling skills as well as
[her] ability to work effectively with cross-functional
partners."  (Dkt. # 42, Ex. 14.)

     In the fall of 2003, the Plaintiff sought and obtained the
involvement of Human Resources representatives Marvin Chambers
("Chambers") and Rena Holland ("Holland") in an attempt to change
her mid-year PDP.  In late 2003 and early 2004, the Plaintiff,
Fitzpatrick, Coveney, Chambers, and Holland engaged in a series
of meetings and correspondence to address the Plaintiff's
complaint.  Apparently the Plaintiff was complaining about her
treatment by her supervisors and her mid-year PDP.

     The Plaintiff alleges that during the period of time that
she reported to Fitzpatrick and/or Coveney she was treated
differently from her similarly situated white and Hispanic co-
workers.  The Plaintiff contends that she was regularly excluded
from, or discouraged from participating in, training and personal
development opportunities that were provided to non-African
American employees of the Defendant.  She further alleges that
she was denied office space and account resources provided to

non-African American employees and that Coveney's interactions with the Plaintiff were different from those with all of the non-African American members of her team.

On January 23, 2004, the Plaintiff met with Coveney[1] to raise a series of complaints, including her difficulties with Duchess, her claims that she unfairly had been denied office space and account resources, and her allegation that she did not have a "joking" relationship with Coveney. The Plaintiff also indicated that she had been "sexually harassed" by one of the Duchess representatives. The Defendant performed an investigation into the Plaintiff's sexual harassment allegation; the investigation concluded that there was insufficient evidence to substantiate the Plaintiff's allegation.

On February 4, 2004, the Plaintiff, Coveney, Fitzpatrick, Holland, and Chambers held a meeting to address the Plaintiff's 2003 mid-year PDP and her other employment complaints. During the meeting, the group agreed to take a number of actions to resolve the Plaintiff's complaints, including making certain revisions to the PDP, providing the Plaintiff with information about the allocation of company resources to different accounts, and having Coveney examine the office space policies applicable

---

[1] As of January 2004, Fitzpatrick was no longer the Plaintiff's supervisor.

to the Plaintiff.  This meeting was documented in a memorandum
from Chambers dated February 9, 2004.  In this memorandum,
Chambers represented that, at the conclusion of the meeting,
Holland asked the Plaintiff whether her concerns had been
addressed fairly, and the Plaintiff replied that they had.  The
Plaintiff, for her part, provided her own summary of the meeting
in a memorandum dated March 5, 2004.

At the Plaintiff's 2004 mid-year review, Coveney emphasized
the importance of "establishing collaborative working
relationships," and discussed the need for the Plaintiff to
cooperate with both her managers and fellow team members.  The
Plaintiff claims she had "good working relationships with people"
during this time period. (Dkt. # 40, Ex. 2)

In October 2004, there was an incident between the
Plaintiff and a co-worker named Christine McDonagh. The Plaintiff
claims that McDonagh removed some of the Plaintiff's papers from
a printer and shredded them. The Plaintiff left a note on
McDonagh's desk, and claims that McDonagh followed her into a
bathroom, blocked her exit, and yelled at her.  The Plaintiff
reported the incident to Coveney.  According to the Plaintiff,
she stated to Coveney that "if I were to roll up on you the way
that Chris rolled up on me. . .," to which Coveney responded "I
don't speak your language."  (Dkt. # 39, Ex. 1)

Also in October 2004, Coveney and her sales team participated in a two-day training program.  At the end of the program, the Plaintiff asked to speak privately with Coveney. During their private conversation, the Plaintiff again raised with Coveney various employment-related complaints, including her not being invited to attend the Women in Foodservices Forum, her dissatisfaction with the PDP process generally, poor communications between herself and Coveney and her failure to be included in team social outings.  The Plaintiff documented the substance of this conversation in an email to Coveney on October 29, 2004.

For approximately one month between December 2004 and January 2005, the Plaintiff was away from the office on a combined vacation and bereavement leave in connection with the illness and death of her grandmother.  During the Plaintiff's absence, Margie Levin ("Levin"), a regional associate on the operations team tried to schedule a juice tasting for her regarding a potential customer, Connecticut College. This lead came from the Plaintiff's customer Thurston Foods.  Levin left the Plaintiff several messages telling her about the meeting. Upon the Plaintiff's return she cancelled the meeting which was scheduled for her first day back.

The Defendant claims this was only the start of the problem concerning Connecticut College. According to the Defendant, the Plaintiff further mishandled the Connecticut College opportunity by delivering excess samples to Connecticut College, and by trying to sell the college soda when it was only interested in juice.  The Defendant also alleges that during a telephone conversation between the Plaintiff and Levin concerning Connecticut College, the Defendant was rude to Levin and hung up on her.

The Plaintiff claims she was forced to cancel the initial tasting for Connecticut College as it was her first day back after a month off and there was bad weather. She also alleges she later conducted a juice tasting with the college and only referenced soda sales in accordance with the Defendant's policies for sales techniques. The Plaintiff further claims it was not customary for Levin to set up meetings for her, and she did not hang up on Levin during the telephone conversation about Connecticut College.

Around this time Coveney claims that she continually received reports that the Plaintiff was complaining about Coveney specifically and the Defendant generally to other employees. Coveney claims these employees expressed to her that the

Plaintiff's complaints were creating an uncomfortable work environment.

In mid-January 2005, Coveney's team attended a meeting in Philadelphia, Pennsylvania. Prior to the meeting, Coveney had asked the team to prepare presentations addressing how each planned to meet their sales goals in the coming year. The group also discussed the best way to cover the duties of the Sales Associate, a position subordinate to Sales Executive that had not been filled in Connecticut for some time. When asked about the group's suggestions, the Plaintiff responded "it sounds good because it couldn't get any worse." (Dkt. # 39, Ex. 1)

The Plaintiff subsequently stated to Coveney in front of the group that "I need to talk to you off line regarding expectations of me." (Dkt. # 42, Ex. 17) Coveney then adjourned the meeting and met separately with the Plaintiff. The Plaintiff proceeded to tell Coveney that she thought Coveney had been hard on her during the group meeting. The Plaintiff then started crying and told Coveney she wanted "to have an open door meeting to improve upon the relationship and also to have a better understanding of how we can work better together." (Dkt. # 39, Ex. 1)

On February 9, 2005, the Plaintiff availed herself of the first step of the Defendant's SOLUTIONS policy[2], an open door meeting with Coveney and Barbara Poremba ("Poremba"), who was Coveney's supervisor.  The Plaintiff created an agenda listing the issues she wished to cover at this meeting.  These issues included: her performance review and promotion concerns, her relationship with McDonagh, the Connecticut College situation, the handling of her bereavement leave, relationships with outside parties (customers, vendors, bottling partners, distributors, etc.), and communications among team members.  During the open door meeting the Plaintiff, in addition to discussing the issues outlined in the memo, stated that she "was uncomfortable as the only African- American reporting in to the Stamford office  and the Waltham office."  (Dkt. # 51, Ex. 4)

On February 23, 2005, the Plaintiff met again with Coveney and Poremba and during that meeting was placed on a Performance Improvement Plan ("PIP").  Under the Defendant's Corrective Action policy, an employee whose performance does not meet job requirements can be placed on a PIP.  If the employee fails to improve performance during the PIP, the employee is subject to termination.

---

[2] The Solutions Policy was a 5-step program designed to resolve workplace issues "quickly, fairly, and confidentially."

In normal circumstances, the first step of the Corrective Action policy is counseling, which usually includes at least three formal counseling sessions over a 60 day period. The Plaintiff was not given three counseling sessions prior to being placed on a PIP.  The Defendant's explanation for its departure from the general guidelines of the Corrective Action policy is that the Plaintiff's actions warranted an expedited schedule. The Court notes, however, that the performance counseling memo informing the Plaintiff  she was being placed on a PIP included references to incidents occurring in late 2003 and early 2004. (Dkt. # 42, Ex. 21)

The stated purpose of the PIP was to improve upon the Plaintiff's relationships with co-workers and customers, or, as expressed in the performance counseling memo sent to the Plaintiff by Coveney, "establishing collaborative working relationships" and "building value based relationships."  (Id.) The stated duration of the PIP was "60 days, beginning on February 23, 2005 and ending April 18, 2005." [3] (Id.)

The Plaintiff contends that Coveney instituted the PIP due to racial animus.  According to the Plaintiff, Coveney had to rely on subjective indicators for the PIP so the evaluations could be manipulated, since there were no problems with the

[3] The Court notes that 60 days from February 23, 2005 was April 24, 2005.

Plaintiff's sales numbers.  The Defendant does not dispute that the Plaintiff had acceptable sales numbers.  The Plaintiff also claims that Coveney never expected her to successfully complete the PIP, because the improvements Coveney expected could not be accomplished in sixty days.

A requirement of the PIP was that the Plaintiff was to meet with her assigned mentor, Harry Clow ("Clow").  Clow was assigned as the Plaintiff's mentor by Coveney.  The Plaintiff stated that she was concerned about working with Clow because she believed he had made disparaging remarks about Martin Luther King. According to the Plaintiff, Coveney made the selection of Clow with a discriminatory animus.  The Plaintiff states that she had previously sought permission to be mentored by Rhonda Lege, an African American Executive based in Atlanta and that this was one of the topics discussed during the February open door meeting. At the February meeting Poremba agreed to allow Lege to act as the Plaintiff's informal mentor.  Due to the PIP the Plaintiff was required to work with her formal mentor, Clow, on a regular basis.

On April 12, 2005, the Plaintiff was advised that the PIP would be extended.  On April 18, 2005, the Plaintiff drafted a memo to Poremba,  Karen Bertha (Ethics and Compliance officer), and Milly Gore (Human Resources representative) stating that

Coveney's "case against me was false and a pretext for discriminatory animus." (Dkt. # 42, Ex. 27) In that same memo, the Plaintiff expressed her belief that she had been placed on a PIP "as [a] result of me requesting an Open Door meeting" and that under these circumstances "extension of my PIP is wholly unfair and should not be allowed." (Id.)

A file memo from Coveney dated April 28, 2005 states that "I am in receipt of the memo from Jere Eaton dated 4/18/05 and want to take this opportunity to clarify the allegations and process." (Dkt. # 42, Ex. 28) Coveney's memo goes on to state that "I continue to have grave concerns over Jere Eaton's lack of progress on Building Value Based Relationships and Establishing Collaborative Working Relationships. Based on the limited improvements, I elected to extend the PIP process for an additional period. . . . Due to the fact that it is difficult to measure and that Barbara and I have seen limited behavioral changes it is in the best interest of the Associate to continue the process for an additional 30 days."[4] (Id.)

At a PIP follow-up meeting on April 29, 2005, Coveney asked the Plaintiff about a complaint concerning the Plaintiff's

_____

[4]The Plaintiff alleges that Coveney wished to continue the process for an additional 30 days so she could fire the Plaintiff on her birthday, which was May 27. The Court finds that this allegation, while disturbing if true, is not particularly probative of the issues presented by the pending summary judgment motion.

behavior from the Waterford Hotel Group, which was one of the Plaintiff's accounts. According to the Defendant, the customer representative stated that he no longer wanted to work with the Plaintiff. The Plaintiff told Coveney she had explained to the customer that her conduct was the result of her being on medication and not feeling her best. The Plaintiff acknowledges that there was a conflict in her initial interactions with the Waterford Hotel Group representative, but contends that she and the representative had worked through their miscommunications prior to the April 29, 2005 meeting and were focused on having a productive relationship.

The Defendant claims that the Plaintiff's performance failed to improve during the time she was on the PIP. The Defendant lists a number of examples of the Plaintiff's alleged unsatisfactory performance during the PIP, including, but not limited to, the following:

- the Plaintiff failed to take responsibility for her failed relationships with the company and with the Defendant's customers;

- the Plaintiff viewed the PIP as a simple checklist in which she could simply perform a specified action without improving the underlying behavior at issue;

- in PIP follow-up meetings, the Plaintiff used profanity and told Coveney she "hates everything about the company." (Dkt. # 42, Ex. 30)

- Coveney continued to receive complaints about the Plaintiff from the Plaintiff's peers and continued to have concerns about how the Plaintiff addressed her teammates;

- the complaint by a representative of the Waterford Hotel Group about the Plaintiff and the statement that the representative no longer wished to work with the Plaintiff because of her behavior.

On May, 16 2005, Coveney recommended the termination of the Plaintiff's employment. After Coveney's recommendation was adopted by the Defendant's Separation committee, the Plaintiff's employment was terminated on May 26, 2005.


## II. DISCUSSION

The Defendant contends that pursuant to Fed. R. Civ. P. 56 it is entitled to summary judgment as to each of the Plaintiff's claims, since those claims either fail as a matter of law or because the Plaintiff has failed to raise a triable issue of fact. The Plaintiff responds that there are multiple issues of material fact in dispute as to each of her claims and that, as a result, the Defendant's motion for summary judgment must be

denied in its entirety.  Each of theses contentions will be
discussed below.

## A. STANDARD

A motion for summary judgment may be granted "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56.

Summary judgment is appropriate if, after discovery, the
nonmoving party "has failed to make a sufficient showing on an
essential element of her case with respect to which she has the
burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  "The burden is on the moving party 'to demonstrate the
absence of any material factual issue genuinely in dispute.'"
American International Group, Inc. v. London American
International Corp., 664 F.2d 348, 351 (2d Cir. 1981)(quoting
Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1319-
20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Aldrich v. Randolph Central School
District, 963 F.2d 520, 523 (2d Cir. 1992)(quoting Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The Court must

view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id. In the specific context of an employment discrimination claim, the Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent."  Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).

## B. RACE DISCRIMINATION

The Plaintiff alleges that she was subjected to unfavorable terms and conditions of employment, including being placed on a PIP and ultimately being terminated, because of her race.  Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin. . . ."  42 U.S.C. § 2000e-2 (a)(1).

Title VII discrimination claims are analyzed using the familiar burden-shifting framework set forth by the Supreme Court

in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  The

Second Circuit has described the applicable legal standard for

the evaluation of employment discrimination claims as follows:

"the plaintiff bears the initial burden of establishing a prima

facie case of discrimination. If the plaintiff does so, the

burden shifts to the defendant to articulate some legitimate,

non-discriminatory reason for its action.  If such a reason is

provided, plaintiff may no longer rely on the presumption raised

by the prima facie case, but may still prevail by showing,

without the benefit of the presumption, that the employer's

determination was in fact the result of racial discrimination."

<u>Holcomb,</u> 521 F.3d at 138 (internal quotation marks and citations

omitted).

 i.  Prima Facie Case

 To meet her burden of establishing a prima facie case of

discrimination under Title VII, the Plaintiff must show: "(I)

membership in a protected class; (ii) qualifications for the

position; (iii) an adverse employment action and (iv)

circumstances surrounding that action giving rise to an inference

of discrimination."  <u>Collins v. N.Y. City Transit Authority</u>, 305

F.3d 113, 118 (2d Cir. 2002).  There is no dispute that the

Plaintiff, an African American woman, is a member of a protected

class, or that her placement on a PIP and discharge were adverse employment actions.

"As to the second element of a <u>McDonnell Douglas</u> prima facie case, a plaintiff must establish that [s]he was performing [her] job at a level that met [her] employer's legitimate expectations. . . ." <u>Huhn v. Koehring Co.</u>, 718 F.2d 239, 243 (2d Cir. 1983)(internal quotation marks omitted). The question of whether the Plaintiff was performing her job at a level that met the Defendant's legitimate expectations goes to the heart of the dispute between the parties. The Plaintiff contends she was performing at a level that met legitimate expectations and points to objective indicators such as her sales volumes as evidence of her satisfactory performance. The Defendant, on the other hand, contends that a sales executive's performance is measured according to both objective and subjective goals (the "whats" and "hows") and that the Plaintiff's performance was not acceptable with regard to the "hows." As expressed by Defendant's Human Resources manager, the Plaintiff's PIP was "about interpersonal skills-not her volume production or other metrics. . . . Even after personal coaching. . . she is not getting that it's the HOW she behaves that the PIP is focused around, as opposed to the actual financial result." (Dkt. # 42, Ex. 25)

Clearly there is a major difference of opinion between the Plaintiff and the Defendant as to the Plaintiff's job performance both in terms of the approach to the issue and as to the result. For purposes of determining whether the Plaintiff has established a prima facie case of discrimination, the Court must be guided by the principles that (1) "the showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is 'de minimis,'" Cronin v. Aetna Life Insurance Co., 46 F.3d 196, 203-04 (2d Cir. 1995), and (2) at this stage of the proceeding "the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. . . ." Id. at 202. In light of these admonitions, the Court concludes that the Plaintiff has made a sufficient showing as to the second element of her prima facie case.

"To complete h[er] prima facie case, plaintiff must introduce evidence that [s]he was terminated under circumstances which give rise to an inference of unlawful discrimination." Holcomb, 521 F.3d at 139. Because direct evidence of discrimination is seldom available with respect to an employer's mental processes, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence. Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 135 (2d

Cir. 2000).  In determining whether a plaintiff has satisfied the fourth element of a prima facie case, "the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.  It is not the province of the summary judgment court itself to decide what inferences should be drawn." Cronin, 46 F.3d at 204 (internal quotation marks omitted).

There are various types of circumstantial evidence which can be considered in determining whether the circumstances of an adverse employment action give rise to an inference of discrimination.  Reliance on subjective criteria may be circumstantial evidence supporting an inference of discrimination.  See Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1040 (2d Cir. 1979)("In cases in which discriminatory intent could be inferred from the sequence of events, the courts have generally viewed subjective explanations with considerable skepticism.").  As previously noted, the Defendant's criticisms of the Plaintiff focused on subjective goals, i.e., the "hows" of her job performance, as opposed to the "actual financial results" she produced.  This reliance on subjective criteria, while not conclusive in and of itself, is evidence that can be used in support of an inference of discrimination.

A decision maker's failure to follow usual company policies or procedures may be circumstantial evidence supporting an inference of discrimination.  <u>See</u> <u>Stern v. Trustees of Columbia University</u>, 131 F.3d 305, 313 (2d Cir. 1997).  The Defendant clearly did not follow its usual Corrective Action  policy with regard to placing the Plaintiff on a PIP.  The normal first step of the Corrective Action policy is counseling, which usually includes at least three formal counseling sessions over a 60 day period.  The Plaintiff was not given any counseling sessions prior to being place on a PIP. Placement of an employee on a PIP is a very serious step in the Corrective Action process since failure to improve performance during the PIP subjects the employee to termination.

The Defendant contends the Plaintiff's actions warranted an expedited Corrective Action process that did not include counseling sessions.  That explanation is questionable in light of the fact that a number of the examples cited in the February 23, 2005 memo advising the Plaintiff of the reasons she was being placed on a PIP were events that occurred in 2003 or 2004. (Dkt. # 42, Ex. 21) The amount of time that passed between the occurrence of these events and the placement of the Plaintiff on a PIP belies an urgent situation requiring expedited action. This apparent inconsistency in the Defendant's reasoning for

deviating from its normal policy can constitute evidence supporting an inference of discrimination.

"The disproportionate termination of. . . employees in the protected class" may also be evidence supporting an inference of discrimination. Maresco v. Evans Chemetics, Division of W.R. Grace & Co., 964 F.2d 106, 112 (2d Cir. 1992); see also Leibowitz v. Cornell University, 584 F.3d 487, 502 (2d Cir. 2009)(evidence that during the relevant time period, in addition to the plaintiff, the defendants had laid off five other employees who were members of the protected class was one of the "variety of circumstances [that] can give rise to an inference of discrimination."). In an annual report issued on December 1, 2005, which covered the period from October 1, 2004 through September 30, 2005, the task force created as the result of the settlement of the Ingram class action lawsuit concluded that "involuntary termination rates were generally higher for minorities than for whites across all job levels. Further investigation of these differences should be explored by the Company." (Dkt. # 51, Ex. 3) Task force reports issued in 2003 and 2006 also found higher rates of involuntary terminations for minority sales workers than rates for white sales workers. (Id.) These reports of "the disproportionate termination of employees

in the protected class" also constitute circumstantial evidence that supports an inference of discrimination.

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to:. . . the more favorable treatment of employees not in the protected group. . . ." <u>Leibowitz</u>, 584 F.3d at 502. The Plaintiff has identified a number of perceived workplace inconsistencies regarding the allotment of resources to her as compared to her non-African American co-workers. Viewing the evidence in the light most favorable to the Plaintiff, which the Court must do at this point, these actions by the Defendant could be circumstantial evidence supporting an inference of discrimination. It is true that not every perceived slight should be seen as evidence of discrimination; however, construing the facts in the light most favorable to the Plaintiff, denying her travel expenditures, office space and training opportunities that were provided to her similarly situated non-African American co-workers could be circumstantial evidence of a discriminatory animus.

The Plaintiff also relies on two comments directed at her by Coveney as further evidence of discriminatory intent. The first comment was made at a 2003 business meeting attended by the Plaintiff, Coveney, and Fitzpatrick. Before Coveney became the

Director of Area Sales for the Boston area, the Plaintiff reported to Fitzpatrick.  After Coveney became the Director of Area Sales, the Plaintiff reported to both Fitzpatrick and Coveney for a period of time.  When the Plaintiff inquired at the meeting as to whom she would be reporting, Coveney responded "well, I guess for a while, you'll have two masters." The Plaintiff states that she found this remark to be racially offensive.

The second comment was made in the fall of 2004.  In reporting an incident involving the Plaintiff and a co-worker named Chris to Coveney, the Plaintiff stated that "if I were to roll up on you the way that Chris rolled up on me. . .," to which Coveney responded "I don't speak your language." According to the Plaintiff, this comment was an additional example of racial bias on the part of Coveney.

"Although evidence of one stray comment by itself is usually not sufficient proof to show. . . discrimination, that stray comment may bear a more ominous significance when considered within the totality of all the evidence. . . . Hence, it furnishes support for [the Plaintiff's] prima facie case." Carlton, 202 F.3d at 136 (internal quotation marks and citation omitted).  The Court recognizes that the two remarks made by Coveney characterized by the Plaintiff as evidence of racial bias

may be, in and of themselves, stray comments not sufficient to show discrimination.  Nevertheless, at this stage of the proceeding they can be considered as part of the totality of the circumstances surrounding the actions challenged by the Plaintiff and, for that reason, "furnish[] support for [the Plaintiff's] prima facie case."  Id.

Based on the cumulative weight of the circumstantial evidence presented by the Plaintiff, the Court concludes that the Plaintiff has satisfied the fourth element of her prima facie case and has, therefore, established a prima facie case of discrimination on the basis of race.

ii.  Evidence of a Non-Discriminatory Reason

The presumption of unlawful discrimination arising out of the establishment of the Plaintiff's prima facie case "drops out of the picture" if the Defendant has proffered "through the introduction of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action. . . ."  Cronin, 46 F.3d at 203 (internal quotation marks omitted) (emphasis in original).

There is no doubt that the Defendant has satisfied its burden of production by way of the introduction of admissible evidence "which, *if believed by the trier of fact*, would support

a finding that unlawful discrimination was not the cause of the employment action" taken against the Plaintiff.  Id. (emphasis in original).  The Defendant claims that the reason the Plaintiff was placed on a PIP was because her work performance was unsatisfactory.  Further, the Defendant claims that the Plaintiff's performance failed to improve during the time she was on the PIP.  The Defendant lists a number of examples of the Plaintiff's alleged unsatisfactory performance during the PIP, including, but not limited to, the following:

- the Plaintiff failed to take responsibility for her failed relationships with the company and with the Defendant's customers;

- the Plaintiff viewed the PIP as a simple checklist in which she could simply perform a specified action without improving the underlying behavior at issue;

- in PIP follow-up meetings, the Plaintiff used profanity and told Coveney she "hated everything about the company."

- Coveney continued to receive complaints about the Plaintiff from the Plaintiff's peers and continued to have concerns about how the Plaintiff addressed her teammates;

- a representative from one of the Plaintiff's accounts, Waterford Hotel Group, complained about the Plaintiff and

indicated that he no longer wished to work with the Plaintiff
because of her behavior.

Unsatisfactory job performance undeniably is "a legitimate
nondiscriminatory reason for discharging [an employee]." Arkais
v. Horan, No. 95Civ.9827 (LLS), 1997 U.S. Dist. LEXIS 3451, at *4
(S.D.N.Y. March 24, 1997). Since the Defendant has met its burden
of production, the Court must proceed to the final step of the
McDonnell Douglas analysis.

iii.  The Plaintiff's Ultimate Burden of Persuasion

"After each party has satisfied her or its initial burdens
under McDonnell Douglas, the plaintiff's ultimate burden of
persuasion is the burden she bore from the outset–to persuade the
trier of fact that she was the subject of illegal
discrimination."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62,
81 (2d Cir. 2001).

The Plaintiff's ultimate burden "may often be carried by
reliance on the evidence comprising the prima facie case, without
more.  Thus, unless the employer has come forward with evidence
of a dispositive nondiscriminatory reason as to which there is no
genuine issue and which no rational trier of fact could reject,
the conflict between the plaintiff's evidence establishing a
prima facie case and the employer's evidence of a
nondiscriminatory reason reflects a question of fact to be

resolved by the factfinder after trial." <u>Cronin</u>, 46 F.3d at 203
(citations omitted); <u>see also</u> <u>Kwentoh v. Connecticut Department</u>
<u>of Children and Families Juvenile Training School</u>, 588 F.Supp.2d
292, 299 (D. Conn. 2008)("Ordinarily, plaintiff's evidence
establishing a prima facie case and defendant's production of a
nondiscriminatory reason for the employment action raise a
question of fact to be resolved by the factfinder after a
trial.")

Although the Plaintiff may not have demonstrated that the
Defendant's proffered reasons for her placement on a PIP and her
termination played no role in its employment decisions, she is
not required to do so in order to carry her ultimate burden.
"Since Congress confirmed the pre-1991 understanding of Title VII
that race. . . need not be the sole motivation for adverse
employment action, it necessarily follows that a Title VII
plaintiff can prevail by proving that an impermissible factor was
a 'motivating factor,' without proving that the employer's
proffered explanation was not some part of the employer's
motivation." <u>Fields v. New York State Office of Mental</u>
<u>Retardation and Developmental Disabilities</u>, No. 96-7523, 1997
U.S. App. LEXIS 19794, at *14 (2d Cir. N.Y. May 23, 1997).

"On a motion for summary judgment, a court cannot try
issues of fact; it can only determine whether there are issues to

be tried.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Cronin, 46 F.3d at 203 (internal quotation marks and citations omitted).  The Court has already concluded that the Plaintiff has provided facts sufficient to show that her placement on a PIP and her discharge occurred under circumstances giving rise to an inference of racial discrimination.  While the Defendant has produced evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of these adverse employment actions, in the Court's view the Defendant has not "come forward with evidence of a dispositive nondiscriminatory reason as to which there is no genuine issue and which no rational trier of fact could reject." Id.  Because the Court has determined that there are issues of fact to be tried, and because it is not the province of the Court to resolve issues of fact on a summary judgment motion, the Defendant's motion as to the Plaintiff's Title VII racial discrimination claim must be denied.

The Plaintiff also brings a CFEPA race discrimination claim. CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section[] [f]or an employer[]. . . to discharge from employment any individual or to discriminate against such

individual in compensation or in terms, conditions or privileges of employment because of the individual's race. . . ." Conn. Gen. Stat. §46a-60(a)(1). "The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA." Williams v. Quebecor World Infiniti Graphics, 456 F.Supp.2d 372, 383 (D. Conn. 2006); see Vasquez v. Claire's Accessories, Inc., 392 F.Supp.2d 342, 349 (D. Conn. 2005)("CFEPA claims are analyzed in the same manner as Title VII employment discrimination claims.").

Because the Plaintiff's CFEPA race discrimination claim is analyzed in the same manner as her Title VII race discrimination claim, the Court need not go into further detail as to the CFEPA claim. The Court has already analyzed the Plaintiff's Title VII race discrimination claim and found that it survives summary judgment. Therefore, the Plaintiff's CFEPA race discrimination claim also survives summary judgment. Consequently, with regard to the Plaintiff's CFEPA race discrimination claim, the Defendant's motion for summary judgment is denied.

## C. RETALIATION

The Plaintiff also claims she was placed on a PIP and then terminated from her employment in retaliation for complaining about race discrimination and that these actions by the Defendant violated both Title VII and CFEPA. Title VII and CFEPA prohibit

retaliation against employees who exercise rights protected by those statutes. See 42 U.S.C. §2000e-3(a); Conn. Gen. Stat. §46a-60 (a)(4). Title VII retaliation claims use the McDonnell Douglas burden-shifting framework. See Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997). CFEPA retaliation claims are analyzed in the same manner as Title VII claims. See Brittell v. Department of Correction, 247 Conn. 148, 164 (1998); Webster v. Pomperaug Regional School District 15, No. 3:04CV1265 (DJS), 2007 U.S. Dist. LEXIS 24165, at *56 (D. Conn. March 30, 2007).

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 292 (2d Cir. 1998). If the Plaintiff is able to establish a prima facie case of retaliation, "the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." Raniola v. Bratton, 243 F.3d 610, 625 (2d Cir. 2001). If the employer provides such a reason, "the burden shifts. . . back to

the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Id.

The Plaintiff alleges that she was placed on a PIP in retaliation for having complained about race discrimination at the open door meeting she had with Coveney and Poremba on February 9, 2005. During the open door meeting the Plaintiff stated that she "was uncomfortable as the only African-American reporting in to the Stamford office and the Waltham office." (Dkt. # 51, Ex. 4)

In order to establish a prima facie case of retaliation with respect to that claim, the Plaintiff must first demonstrate that she was engaged in activity protected under Title VII. While it is true that the protection afforded by Title VII extends to "informal protests of discriminatory employment practices," Sumner v. U.S. Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), it is equally true that "[a]n employee must allege some form of discrimination prohibited by Title VII for the complaint to be protected." Williams v. Home Depot U.S.A., Inc., No. 02 Civ. 5353 (DAB), 2005 U.S. Dist. LEXIS 22254, at *44 (S.D.N.Y. Sept. 30, 2005), aff'd, 196 Fed. Appx. 47 (2d Cir. 2006).

The Plaintiff's statement at the February 2005 open door meeting that she was uncomfortable as the only African American

reporting to the Stamford and Waltham offices referred to her race, but it did not make any mention of discrimination. The specific reason she gave for being uncomfortable concerned the number of African Americans employed-- not that she was being discriminated against. "[I]n order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring." <u>Neishlos v. City of New York</u>, No. 00 Civ. 914 (SAS), 2003 U.S. Dist. LEXIS 19554, at *25 (S.D.N.Y. Nov. 3, 2003)(internal quotation marks omitted). Since the Plaintiff's statement at the open door meeting did not put the Defendant on notice that she believed discrimination was occurring, that statement was not a protected activity. Accordingly, the Plaintiff has not established a prima facie case of retaliation as to this claim. Consequently, the Defendant's summary judgment motion is granted as to the Plaintiff's retaliation claim regarding her placement on a PIP.

The Plaintiff also alleges that she was terminated by the Defendant in retaliation for having complained about race discrimination. In asserting this claim, the Plaintiff makes specific reference to an April 18, 2005 written communication from her to Poremba, Karen Bertha (Ethics and Compliance officer), and Milly Gore (Human Resources representative) stating that Coveney's "case against me was false and a pretext for

discriminatory animus." (Dkt. # 42, Ex. 27) The Court concludes that this complaint did put the Defendant on notice that the Plaintiff believed discrimination was occurring and consequently was activity protected under Title VII.

As has been previously noted, the protection against retaliation afforded by Title VII extends to "informal protests of discriminatory employment practices, including making complaints to management. . . ." Sumner, 899 F.2d at 209. Although the Plaintiff's April 18, 2005 memo did not specifically include the term "race discrimination," the statement that the Plaintiff's supervisor's case against her was "a pretext for discriminatory animus" was sufficient to put the Defendant on notice that the Plaintiff was complaining about discrimination prohibited by Title VII. "[T]here are no magic words that must be used when complaining about a supervisor" in order to qualify a complaint as protected activity. Neishlos, 2003 U.S. Dist. LEXIS 19554 at *25 (internal quotation marks omitted). Additionally, while the Plaintiff's statement at the February 2005 open door meeting that she was uncomfortable being the only African American reporting to the Stamford and Waltham offices was not itself a protected activity, that statement in conjunction with the Plaintiff's April 18, 2005 memo certainly

provided adequate notice to the Defendant that the Plaintiff was complaining about discrimination prohibited by Title VII.

The Plaintiff clearly has established the first three elements of a prima facie case of retaliation with regard to her April 18, 2005 written communication.  For the reasons previously stated, this was protected activity.  The Defendant was aware of this protected activity and took adverse employment action against the Plaintiff by terminating her.

The fourth element of the Plaintiff's prima facie case of retaliation is a causal connection between her protected activity, i.e., the April 18, 2005 written complaint about discrimination, and the adverse employment action which was her termination.  "The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence. . . ."  Sumner, 899 F.2d at 209.  "[P]roof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action. . . . Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal. . . right and an allegedly retaliatory action, some district courts have generally concluded that a passage of two months between the protected

activity and the adverse employment action seems to be the
dividing line."  McCowan v. HSBC Bank USA, N.A., 689 F.Supp.2d
390, 413 (E.D.N.Y. 2010)(internal quotation marks and citations
omitted).

The Defendant terminated the Plaintiff's employment on May
26, 2005, which was five weeks and three days after April 18,
2005, the date of the Plaintiff's memo complaining about
discrimination.  The Court finds that the temporal relationship
between the protected activity and the adverse employment action
establishes the causal connection necessary to establish the
Plaintiff's prima facie case of retaliation.

The Court has already discussed the evidence pertaining to
the Defendant's articulation of a legitimate, nondiscriminatory
reason for the Plaintiff's termination, as well as the
Plaintiff's evidence of pretext, in the context of the
Plaintiff's claim of race discrimination.   For the same reasons
the Court concluded that there are issues of fact to be tried
with respect to the race discrimination claim, the Court likewise
concludes that there are issues of fact to be tried with respect
to the Plaintiff's retaliation claim regarding her termination.
With regard to the Plaintiff's retaliation claim, the Court notes
that "if the employer was motivated by retaliatory animus, Title
VII is violated even if there were objectively valid grounds for

the discharge." Sumner, 899 F.2d at 209. Accordingly summary judgment is unwarranted as to that claim. See McCowan, 689 F.Supp.2d at 414-15 ("Based upon the timing of the termination in connection with the protected activity and the other evidence discussed *supra* with respect to the discrimination claims, plaintiff has created genuine issues of fact regarding whether defendant's proffered reason for plaintiff's termination was a mere pretext and whether a retaliatory motive played a role in the adverse employment action. Thus, summary judgment on this issue is unwarranted."). Consequently, the Defendant's summary judgment motion is denied as to the Plaintiff's Title VII and CFEPA retaliation claims regarding her termination.

## III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment **(Dkt. # 36)** is **GRANTED in part** and **DENIED in part**.

The Court **GRANTS** summary judgment as to the Plaintiff's retaliation claim regarding her placement on a PIP.

The Court **DENIES** summary judgment as to all remaining claims.

**The Court feels that a settlement conference would be helpful in determining some, if not all, of the remaining issues.**

Therefore, the Plaintiff and the Defendant are instructed to notify the Court forthwith whether they consent to have this case referred to a United State Magistrate Judge for the purpose of conducting a settlement conference.

**SO ORDERED** this 19th day of July, 2010.


_____/s/   DJS_____

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**